# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00817-COA

JENNIFER NICOLE SIMMONS LOWREY                                          APPELLANT

v.

RYAN SIMMONS                                                                            APPELLEE

DATE OF JUDGMENT:               06/11/2014
TRIAL JUDGE:                          HON. JOHN ANDREW HATCHER
COURT FROM WHICH APPEALED:   MONROE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       DANNY L. LOWREY
ATTORNEY FOR APPELLEE:        STEPHEN TRAVIS BAILEY
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:       TERMINATED APPELLEE'S OBLIGATION
                                            TO PAY CHILD SUPPORT EXPENSES AND
                                            UPHELD AWARD OF ALIMONY TO
                                            APPELLANT
DISPOSITION:                         REVERSED AND REMANDED ON DIRECT
                                            APPEAL, AND AFFIRMED ON CROSS-
                                            APPEAL - 09/29/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE IRVING, P.J., MAXWELL AND WILSON, JJ.

### WILSON, J., FOR THE COURT:

¶1.     Jennifer Nicole Simmons Lowrey appeals the judgment of the Monroe County Chancery Court terminating her ex-husband's child support payments, including his obligation to pay college expenses, and challenges the chancellor's manner of appointment and utilization of a guardian ad litem (GAL). Ryan Simmons cross-appeals the chancellor's decision not to terminate his alimony obligations to Jennifer retroactive to the date of her

remarriage. We reverse the chancellor's termination of child-support payments, including college expenses, and remand for further proceedings consistent with the opinion. We otherwise affirm the judgment below.

## FACTS AND PROCEDURAL HISTORY

¶2. Jennifer and Ryan divorced in December 2008, settling all issues of property, support, and custody in a court-approved settlement agreement. Pursuant to the agreement, Jennifer and Ryan were to share joint legal custody of their daughter, Jilanna, then thirteen years old. Jennifer was given primary physical custody of Jilanna, but Ryan had specific visitation rights, including every other weekend, alternating holidays, and four weeks during Jilanna's summer vacation. Ryan agreed to pay Jennifer $450 per month in child support until Jilanna graduated from college or, if she did not attend college, when she reached twenty-one years of age or was otherwise emancipated by the chancery court. Ryan also agreed to pay all of Jilanna's extracurricular fees and expenses; the costs of Jilanna's school clothing, not to exceed $500 per year; the costs of an automobile for Jilanna when she obtained her driver's license, including insurance, maintenance, and taxes; and college expenses, excluding sorority fees. Finally, Ryan agreed to pay Jennifer alimony of $900 per month.

¶3. On March 23, 2012, Ryan filed a complaint in the chancery court, seeking to have the alimony provisions of the settlement agreement declared void and to have alimony payments terminated retroactively from the date of Jennifer's remarriage in 2010. Ryan also sought to have Jennifer cited for contempt for failure to comply with the joint custody provisions of the settlement, including his visitation rights. Finally, Ryan sought to terminate or reduce

2

his future child support obligations, including college expenses, and reduce his past child support payments. This request was based on Jilanna's alleged refusal to have any contact with him or, in the alternative, his own reduction in income. Jennifer answered Ryan's complaint and filed a counterclaim, seeking to have Ryan cited for contempt for failure to pay child support and alimony.

¶4. The chancellor appointed a GAL "to investigate the facts and circumstances related to any alleged refusals to visit with [Ryan] by [Jilanna] and as to the issues of the erosion of the parent/child relationship." After interviewing the parties and Jilanna and reviewing relevant documents, the GAL issued his report. The GAL found no legal basis to recommend termination or modification of child support payments. However, he did recommend a modification of college expenses to be paid by Ryan based upon the "complete atrophy" of the father-daughter relationship. The GAL found that Ryan, as the father, "had a greater responsibility in nurturing their relationship and [was] therefore . . . greater, though not solely, at fault." However, the GAL also noted that Jilanna now "refer[red] to her step-father as her dad" and sometimes used his last name, Lowrey, rather than Simmons. Based on these findings, the GAL recommended that Ryan's obligation be reduced to one-half of all college expenses not covered by financial aid. The GAL further recommended that Ryan and Jilanna attend counseling to attempt to rebuild their relationship, and if Jilanna refused or failed to attend counseling, Ryan's obligation for college expenses should be terminated in full.

¶5. In January 2014, after a four-day trial, the chancellor entered a judgment resolving Ryan's claims and Jennifer's counterclaim. The chancellor found Ryan in contempt for his

failure to pay various expenses, child support, alimony, and previously ordered attorney's fees. He ordered Ryan to pay certain sums to Jennifer to purge himself of contempt. The chancellor also suspended, but did not fully terminate, Ryan's obligations to pay child support and college expenses. The chancellor set a review hearing for May 14, 2014, at which time these obligations would be terminated "unless," in the interim, "there [was] a substantial and material change in the circumstances," i.e., "a reconciliation between [Ryan] and [Jilanna]."

¶6. The chancellor also found Jennifer in contempt for her failure to discuss decisions regarding Jilanna with Ryan. However, the chancellor found that no punishment was warranted due to "mitigating factors," namely, Jennifer's prolonged hospitalization in 2010 and 2011 due to lung disease and a double lung transplant and her continued illness and life expectancy of four years. During Jennifer's hospitalization, the chancellor noted, Ryan "made no effort whatsoever, to have Jilanna . . . live with him or even visit," even though "they were living near each other." "[I]nstead, . . . Jilanna stayed with her step-father, all of which constituted inexcusable parental neglect by [Ryan] in the [chancellor's] eyes."

¶7. Following the May 14, 2014 review hearing, the chancellor entered a final judgment, reaffirming much of the judgment from January 2014. However, the chancellor noted that since the original judgment, Jilanna had made no effort to reconcile with Ryan; thus, the chancellor terminated Ryan's future obligations to pay child support and college expenses. The chancellor subsequently entered a final corrected judgment on June 11, 2014. Jennifer timely appealed this judgment, and Ryan filed a notice of cross-appeal from the same.

4

Jennifer's appeal challenges the chancellor's (1) appointment of the GAL and failure to state reasons for not following his recommendations and (2) termination of Ryan's obligation to pay child support and college expenses. Ryan's cross-appeal challenges the chancellor's ruling that his alimony payments did not terminate upon Jennifer's remarriage.

## STANDARD OF REVIEW

¶8. "We employ a limited standard of review on appeals from chancery court." *Legacy Hall of Fame Inc. v. Transp. Trailer Serv. Inc.*, 139 So. 3d 105, 107 (¶9) (Miss. Ct. App. 2014) (citing *Miller v. Pannell*, 815 So. 2d 1117, 1119 (¶9) (Miss. 2002)). This appeal involves questions of both law and fact. "We . . . will not disturb the factual findings of a chancellor when supported by substantial evidence unless we can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Biglane v. Under The Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007) (quotation marks and brackets omitted). "We use a de novo standard when analyzing questions of law." *Id.* at 14 (¶17).

## ANALYSIS

### I. Appointment of the Guardian ad Litem

¶9. In her first issue, Jennifer argues that the chancellor's appointment of the GAL was reversible error because the chancellor's order did not properly outline the role of the GAL as required by the Supreme Court in *S.G. v. D.C.*, 13 So. 3d 269, 281 (¶¶48-49) (Miss. 2009). In *S.G.*, the Supreme Court encouraged chancellors

> to set forth clearly the reasons an appointment has been made and the role the guardian ad litem is expected to play in the proceedings. To avoid potential

5

problems regarding confidential communications and other expectations, chancellors should make clear: (1) the relationship between the guardian ad litem and the children, incompetent, or other ward of the court; (2) the role the guardian ad litem will play in the trial; and (3) the expectations the trial judge has for the guardian ad litem. The role a chancellor expects a guardian ad litem to play should be set forth clearly in the written order of appointment. Doing so will make the guardian ad litem's relationships and general responsibilities clear to each of the parties (including those wards old enough to comprehend), the attorneys, the court, and to the guardian ad litem.

*Id.* at (¶48). In *S.G.*, the chancellor did not clearly define the purpose or role of the GAL. In the original order, the chancellor in *S.G.* wrote, "[T]he parties are ordered to cooperate fully with the appointed [GAL] and to promptly execute and deliver any and all authorizations necessary for the [GAL] to communicate with counselors, physicians, forensic professionals and others regarding the minor children." *Id*. at (¶51). There were no other instructions to the parties, the attorneys, or the GAL. Furthermore, the chancellor seemed to view the role of the GAL as a special master at times and an attorney for the minor children at others. *Id*. at (¶50). Although the Supreme Court ultimately reversed the chancellor for other reasons, it took the opportunity to "encourage chancellors to define clearly the role and responsibility of the [GAL]," emphasizing that "[c]hancellors should not (as happened in this case) appoint a [GAL] to serve in the dual role of advisor to the court and lawyer for the child." *Id*. at (¶55).

¶10.    Jennifer argues that the chancellor's appointment of the GAL in the present case failed to comply with the requirements of *S.G.*, leading to confusion about the GAL's role. The relevant order here read: "The Court finds that a [GAL] should be appointed in this cause to investigate the facts and circumstances related to any alleged refusals to visit with [Ryan] by

6

[Jilanna] and as to the issues of the erosion of the parent/child relationship." Jennifer presents nothing to suggest that any questions arose about the GAL's role prior to this appeal. There is no evidence that any party, including Jilanna, had any trouble understanding the GAL's role. Moreover, through her counsel, Jennifer approved the language of the order. The order clearly defines the GAL's role as that of an investigator of the contested allegations underlying Ryan's complaint, not a representative of or advocate for any particular party or nonparty. There should have been no confusion, and as best we can tell there was none. This issue is without merit.

## II. Recommendations of the Guardian ad Litem

¶11. Jennifer next argues that the chancellor erred by not following the GAL's recommendations.[1] Jennifer asserts that the chancellor misstated the GAL's recommendations and erroneously believed that he was following those recommendations. Jennifer further argues that because the chancellor was not following the GAL's recommendations, he was obligated to explain why he had rejected the them. Jennifer relies on *Floyd v. Floyd*, 949 So. 2d 26, 29 (¶8) (Miss. 2007), in support of her argument. In *Floyd*, the Supreme Court stated, "if the court rejects the recommendations of the guardian, the court's findings must include its reasons for rejecting the guardian's recommendations." *Id.* However, Jennifer fails to note the context of the Court's statement. The Court wrote:

---

[1] Jennifer also claims an that the GAL performed an inadequate investigation, but presents no authority to support her assertion beyond a restatement of his findings and performance. "The law is well established in Mississippi that this Court is not required to address any issue that is not supported by reasons and authority." *Varvaris v. Perreault*, 813 So. 2d 750, 753 (¶6) (Miss. Ct. App. 2001) (citing *Hoops v. State*, 681 So. 2d 521, 535 (Miss. 1996)). Therefore, this issue is waived for failure to cite authority.

> [A] chancellor shall at least include a summary review of the recommendations of the guardian in the court's findings of fact *when the appointment of a guardian is required by law*. . . . While a chancellor is in no way bound by a guardian's recommendations, a summary of these recommendations in addition to his reasons for not adopting the recommendations is required in the chancellor's findings of fact and conclusions of law.

*Id.* (emphasis added).

¶12. The appointment of a GAL is mandatory where there are allegations of abuse or neglect of a minor or where there is a contested termination of parental rights. *See* Miss. Code Ann. § 93-5-23 (Supp. 2014); Miss. Code Ann. § 93-15-107(1) (Rev. 2013). Where the appointment of a GAL is discretionary, there is no requirement that the chancellor state his reasons for deviating from the GAL's recommendations. *Porter v. Porter*, 23 So. 3d 438, 449 (¶28) (Miss. 2009); *Tanner v. Tanner*, 956 So. 2d 1106, 1109 (¶13) (Miss. Ct. App. 2007). Moreover, "there is no requirement that the chancellor defer to the findings of the [GAL]." *S.N.C. v. J.R.D.*, 755 So. 2d 1077, 1082 (¶17) (Miss. 2000).

¶13. There was no allegation of abuse or neglect in the present case. Nor was this an action to terminate parental rights. Thus, the chancellor was under no obligation to appoint a GAL. Because the chancellor's appointment of the GAL was discretionary, he was not obligated to detail his reasons for diverting from the GAL's recommendations. Furthermore, in his order, the chancellor did discuss the recommendations of the GAL. Although the chancellor did not follow the GAL's recommendations, chancellors are never required to adopt the GAL's recommendations. *Id.* ("[T]here is no requirement that the chancellor defer to the findings of the [GAL]. . . . Such a rule would intrude on the authority of the chancellor to make findings of fact and to apply the law to those facts.").

8

### III.    Modification of the Court-Approved Property Settlement Agreement

¶14.    The court-approved settlement agreement between Jennifer and Ryan required Ryan to pay Jennifer $450 per month in child support until Jilanna graduated from college or, should she choose not to attend college, until she turned twenty-one, married, or was otherwise emancipated by the court. In addition, Ryan was required to, inter alia, pay expenses related to Jilanna's schooling and various extracurricular activities, provide medical insurance and pay medical expenses, pay certain automobile-related expenses, and maintain a $500,000 life insurance policy for Jilanna's benefit. Finally, Ryan agreed to pay for Jilanna's college expenses, so long as she attended school in Mississippi and maintained a minimum GPA.

¶15.    In the June 2014 corrected final judgment, the chancellor ordered Ryan to pay Jennifer unpaid child support and other previously owed expenses for the benefit of Jilanna. However, the chancellor terminated Ryan's obligation to pay "all further child support, maintenance, and support obligations," including college expenses, because of Jilanna's "failure to reconcile" with her father. On appeal, Jennifer challenges this aspect of the judgment, arguing that the chancellor's decision to terminate Ryan's obligations was manifest error, an abuse of discretion, and a result of the application of an erroneous legal standard. Discussion of this issue requires further background on the relationship between Ryan and Jilanna and the course of the proceedings below.

¶16.    Jilanna was thirteen years old when her parents divorced in 2008. The chancellor found that the initial breakdown in her relationship with her father resulted from an incident

9

in 2009, when Jilanna was in eighth grade, when her father reasonably and justifiably disciplined her while she was staying with him during a period of visitation. The chancellor found that Jilanna "shunned" her father after this incident and that her "clearly visible deep-seated antipathy . . . toward [her father] . . . stems from that date." Although Jennifer and Jilanna denied this, the chancellor's findings regarding the initial cause of the estrangement are supported by substantial evidence.

¶17. However, the chancellor also found that in the period that followed Ryan "exacerbated" the "alienation between [him] and [Jilanna] . . . by not insisting upon his visitation" and making little effort to contact his daughter. The chancellor rejected Ryan's claim that Jennifer had caused the alienation between Ryan and Jilanna. Rather, the chancellor found "that the erosion of the parent/child relationship was proximately caused by a bare preponderance of the evidence by . . . Ryan and the balance caused by . . . Jilanna."

¶18. In particular, the chancellor found that Ryan was guilty of "inexcusable parental neglect" from approximately November 2010 to March 2011 when Jennifer was hospitalized in North Carolina, suffering from serious lung disease while awaiting and then undergoing a double lung transplant surgery. During this period, the chancellor found, Ryan "made no effort whatsoever to have Jilanna . . . live with him or even visit when they were living near each other, but instead, when [Jennifer] was hospitalized, Jilanna stayed with her stepfather, all of which constituted inexcusable parental neglect in the [chancellor's] eyes." Jilanna was fifteen years old at this point, living with her stepfather in Tupelo, while Ryan lived a short drive away in Amory. These findings are also supported by substantial evidence. In

addition, Ryan remarried in October 2010, but he did not invite Jilanna to the wedding or even tell her that he was getting married. Ryan's new wife was twenty-five years old and brought a son, Ryan's new stepson, to the marriage.

¶19.    Ryan admitted that he had little or no communication with Jilanna from 2009 until March 2012, when he says he sent her some text messages and invited her to his house or to dinner. According to Ryan, Jilanna "rejected" him at this point and told him he "wasn't her father" anymore. On March 23, 2012, Ryan filed the instant complaint seeking to terminate his obligations to pay child support, college expenses, and alimony.

¶20.    The chancellor also found that although Ryan was the proximate and primary cause of the erosion of his relationship with his daughter, "Jilanna . . . herself has exacerbated this erosion by her own deep-seated antipathy toward [Ryan]." The chancellor found that, despite the court's urging, Jilanna had spurned Ryan's efforts during the course of this litigation to pursue joint counseling and reconciliation. The chancellor also observed that "Jilanna . . . was grinning broadly when she testified she would be less likely to see [Ryan]" once she began attending college. In addition, Jilanna has at times publicly used her stepfather's last name and  referred to him as "Daddy," and she stated on the record that she would allow him to adopt her. Based on this evidence, the chancellor concluded "that Jilanna is delighted to have nothing further to do with [Ryan] except receive monetary benefits he is obligated to pay." The chancellor further found that "the more recent periods of failure to reconcile have been proximately caused by the actions and inactions of Jilanna." The chancellor concluded that Jilanna was "nearly an adult, with the ability to make some adult decisions, and she

11

cannot have it both ways," i.e., refuse to reconcile with her father while continuing to insist on his financial support. The chancellor's factual findings were part of the January 2014 judgment and were reaffirmed in the final judgment. Though disputed by Jennifer and Jilanna, all findings of fact are supported by substantial evidence.

¶21. The chancellor found that the erosion of the parent-child relationship and failure to reconcile was a "substantial and material change in circumstances" warranting the termination, effective May 31, 2014, of Ryan's obligations to pay for Jilanna's support and college expenses absent a reconciliation between the two. He set a May 14, 2014 review hearing to determine whether any such reconciliation had occurred. At the review hearing, Jennifer was the only witness and testified that to her knowledge neither Ryan nor Jilanna had reached out to the other since the court's prior ruling. The chancellor then explained that he had delayed entering a final judgment in order to give Jilanna one final opportunity "to mend this fence, and she has not availed herself of it." Therefore, "[t]he last part of this erosion of a family relationship was Jilanna's responsibility and that's where [her] 49 percent [fault] came in, and she just reaffirmed it." Accordingly, the chancellor entered a final judgment terminating Ryan's obligations to pay support and child expenses.

¶22. By the time the final judgment was entered, Jilanna was a student at Mississippi State University. By all accounts she is, as the chancellor found, "an exemplary student." She was the valedictorian of her high school class, participated in a number of extracurricular activities, earned a partial scholarship to Mississippi State, and continued to excel academically in college. Thus, there was no issue of her qualifications or aptitude for

12

college. *See Pass v. Pass*, 238 Miss. 449, 458, 118 So. 2d 769, 773 (1960) (holding that a financially able, non-custodial parent has a duty to provide funds for college if the "child is worthy of and qualified for a college education and shows an aptitude therefor").

¶23. Under Mississippi law, a child generally will not forfeit support from a non-custodial parent unless his or her actions toward the parent are "clear and extreme." *See Caldwell v. Caldwell*, 579 So. 2d 543, 548 (Miss. 1991). However, where the child is college-aged, a "lesser finding" that the child's actions have caused a deteriorated relationship with the parent is sufficient to justify termination of support obligations, including obligations to pay for college. *Stasny v. Wages*, 116 So. 3d 195, 197-98 (¶11) (Miss. Ct. App. 2013). Under *Hambrick v. Prestwood*, 382 So. 2d 474, 477 (Miss. 1980), a parent's duty to support and pay college expenses of a college-aged child "is dependent, not only on the child's aptitude and qualifications for college, but on whether the child's behavior toward, and relationship with the father, makes the child worthy of the additional effort and financial burden that will be placed on him." Although *Hambrick* involved court-ordered support and college expenses, we have since applied its holding to cases, such as this one, involving obligations to which a parent has agreed as part of a comprehensive and voluntary divorce settlement. *See Stasny*, 116 So. 3d at 198, 199 (¶¶14-15, 17); *but see Markofski v. Holzhauer*, 799 So. 2d 162, 170 (¶38) (Miss. Ct. App. 2001) (McMillin, C.J., joined by Southwick, P.J., and Thomas and Lee, JJ., concurring in part and dissenting in part) (criticizing the extension of *Hambrick*'s holding to an obligation voluntarily undertaken as part of a contractual divorce settlement).

¶24. In this case, the chancellor did not cite *Hambrick* or any of its progeny as the basis for

13

his ruling. Instead, he cited a "substantial and material change in circumstances"—the erosion of the parent-child relationship and failure to reconcile—as his reason for terminating Ryan's obligations. Nevertheless, the chancellor's decision appears to track the underlying rationale of the *Hambrick* line of cases, and Ryan has defended it on that basis in this appeal. *Cf. Finch v. Finch,* 137 So. 3d 227, 231, 237-38 (¶¶5, 35) (Miss. 2014) (chancellor found son's "animosity toward his father" was a "material change in circumstances" justifying termination of father's obligation to pay educational expenses; Supreme Court affirmed under *Hambrick*). Therefore, we will apply the applicable *Hambrick* standard.

¶25. Although the *Hambrick* standard is by no means a bright-line rule, it has never been applied to terminate a parent's support obligations in a case such as this, where the chancellor has found, with substantial support in the record, that *the parent* is the primary cause of the erosion of the parent-child relationship—indeed, that the parent is guilty of "inexcusable parental neglect"—and the child's essential fault is in failing to respond to a neglectful, absentee parent's belated efforts at reconciliation. For example, in *Hambrick*, the daughter had no contact with her father for six or seven years, she acknowledged that her dislike of him bordered on hatred, there was a strong inference that the mother was partially to blame for her animosity, and "[t]here [was] *nothing* in this record that would justify [the daughter's] attitude toward her father." *Hambrick*, 382 So. 2d at 477 (emphasis added). In contrast, in *Polk v. Polk*, 589 So. 2d 123, 131 (Miss. 1991), the Supreme Court applied *Hambrick* and reversed a chancellor's decision not to *order* the father to pay the daughter's college expenses because "the problems [between them] appear[ed] to be *partly* [the father's] fault"

14

and the father "seem[ed] to have abandoned [the daughter], either emotionally or financially." (Emphasis added). In light of the father's partial fault and prior abandonment of the child, the Court remanded the issue for further consideration, even though the daughter's conduct toward her father was egregious. She had written letters to her father's family that accused him of immoral acts and stated that he would "rot in hell" and that she would no longer acknowledge him as her father, and she had attempted to persuade local newspapers to publish her accusations, which the Court found "disturbing." *See id.* at 130-31; *id.* at 131-32 (Lee, C.J., dissenting) ("[T]he attitude and actions of Kawanis [Polk] toward her father . . . have been much more egregious than that in *Hambrick*.").

¶26.    Thus, under *Hambrick* and *Polk*, a father is not entitled to full relief from otherwise valid obligations to pay for the support and college expenses of his child—here, obligations that he voluntarily accepted as one component of a comprehensive divorce settlement—based on an estrangement that is in large measure of his own making. Here, as the chancellor found, Ryan neglected his child beginning in at least 2010 and continuing into 2012. This abandonment included an especially "inexcusable" period of neglect when her mother was hospitalized for months, hundreds of miles away, with a life-threatening illness. During this difficult time in his daughter's life, Ryan lived nearby but never so much as visited her. To be sure, in 2012, near the time he filed the instant complaint, Ryan did attempt to reconcile with Jilanna; and the chancellor found that Jilanna, not Ryan, bears primary responsibility for their failure to reconcile. We do not question these findings, and we emphasize that we accept all of the chancellor's findings of fact, which are supported by substantial evidence.

15

However, we hold that *Hambrick* does not apply to the facts found by the chancellor. Where a father's own neglect is the proximate cause of the erosion of his relationship with his child, the child's resistance to belated efforts to reconcile will not relieve the father of obligations of support and to pay college expenses that he voluntarily assumed as part and parcel of his own comprehensive divorce settlement. Accordingly, the part of the judgment suspending and terminating Ryan's support obligations, including his obligation to pay college expenses, is reversed, and the case is remanded for further proceedings consistent with this opinion.[2]

## IV. Alimony

¶27. In his cross-appeal, Ryan argues that the chancellor erred in determining that his alimony payments to Jennifer did not terminate upon her remarriage. Ryan claims that the alimony provision in the parties' settlement agreement is ambiguous and, due to this ambiguity, must be interpreted as providing for periodic alimony terminable upon Jennifer's remarriage. The chancellor, however, found that the alimony provision — which "was not imposed upon [Ryan] but agreed to by [him]" — was an unambiguous, valid, and enforceable provision for a "hybrid" form alimony.

¶28. Ryan and Jennifer's divorce became final on December 29, 2008, and Jennifer remarried on July 26, 2010. The alimony portion of their settlement agreement provides:

> Husband shall pay unto Wife periodic alimony in an amount no less than [$900] per month . . . and shall continue . . . until such time as the Wife's

---

[2] Ryan made an alternative request for a reduction in his various support obligations based on his alleged decrease in income since the time of his divorce. The chancellor "denie[d]" this request as a matter of form only because he granted Ryan's broader request for a full termination of his obligations. As such, the chancellor may consider this separate, more limited request on remand, if it is supported by the evidence under applicable law.

remarriage, the death of the Wife, the death of the Husband or until further Order of this Court. Regardless of whether Wife shall remarry, Husband shall in any event pay alimony in the amount of [$900] per month . . . through the period ending November 10, 2013, in which event the alimony which is received by Wife following her marriage shall be in the nature of lump sum alimony, payable in monthly installments.

¶29. Mississippi law recognizes four types of alimony, *West v. West*, 891 So. 2d 203, 212 (¶20) (Miss. 2004), only two of which are relevant here: periodic and lump sum. In general, periodic alimony is paid monthly and has no fixed termination date but terminates only at the death of the payor or remarriage of the recipient. *Id.* at (¶21). Periodic alimony generally is awarded based upon the needs of the recipient and thus may be modified or terminated if there is a material change of circumstances. *Id.* Lump sum alimony, in contrast, is a fixed and irrevocable amount that can be paid in either a single lump sum or periodic installments. *Id.* at (¶22). "A specific period of time for which payments are to run and a fixed sum of money are two characteristics of lump sum alimony." *Id.* Because lump sum alimony is irrevocable and vests immediately, it cannot be modified based on a change in circumstances, *id*. at (¶23), and becomes an obligation of the payor spouse's estate in the event of his or her death, *In re Estate of Hodges*, 807 So. 2d 438, 443 (¶17) (Miss. 2002).

¶30. Although a court order imposing alimony must, in general, clearly identify what type of alimony is being awarded and adhere to its traditional characteristics, our "Supreme Court has not required consensual support agreements to follow the same terms as for court-imposed alimony." *Elliot v. Rogers*, 775 So. 2d 1285, 1289 (¶15) (Miss. Ct. App. 2000). Rather, the Supreme Court has emphasized divorcing parties' freedom and "broad latitude" to settle the financial aspects of their separation by contract as they see fit:

> In property and financial matters between the divorcing spouses themselves, there is no question that, absent fraud or overreaching, the parties should be allowed broad latitude. When the parties have reached agreement and the chancery court has approved it, we ought to enforce it and take as dim a view of efforts to modify it, as we ordinarily do when persons seek relief from their improvident contracts.

*Weathersby v. Weathersby*, 693 So. 2d 1348, 1351 (Miss. 1997) (quoting *Bell v. Bell*, 572 So. 2d 841, 844 (Miss. 1990)). Therefore, "the parties can go further in their financial agreements at the time of divorce than a chancellor may impose by order." *Elliott*, 775 So. 2d at 1289 (¶16).

¶31. For example, in *East v. East*, 493 So. 2d 927 (Miss. 1986), the Court addressed a settlement agreement containing the following alimony provision:

> That, as alimony and as further consideration for the settlement of the claim of Wife to Husband's properties, Husband agrees to pay unto Wife the sum of [$5,000] per month, . . . said payment not to terminate upon the death of Husband, but shall constitute a charge against his Estate until the death of Wife, irrespective of her possible remarriage. It is the full intention of Husband that Wife shall receive as alimony and as a property settlement from him or his Estate the sum of [$5,000] for each and every month hereafter until her death . . . .

*Id.* at 929. The Court held that the provision was enforceable as either "property settlement or lump sum alimony," notwithstanding that it lacked lump sum alimony's traditional characteristics of a fixed sum payable within a fixed period of time. *Id.* at 931. Accordingly, the Court enforced the provision as written. *Id.*

¶32. In *Elliot*, 775 So. 2d at 1287-88 (¶9), this Court considered another "hybrid" alimony provision of a property settlement agreement, which provided in relevant part:

> Husband shall pay to Wife . . . the sum of $4,000 per month, unless Wife shall die or remarry. . . . Said payments shall be deductible to Husband and taxable

18

> to Wife. In the event of Husband's death . . . Husband's heirs and representatives shall be bound to make said payments until the earlier of Wife's death, remarriage or the expiration of said 120 month period.

The Court noted that the agreement, which was prepared by "quite capable attorneys," did not fit neatly into any accepted alimony category, as it had elements of both lump sum and periodic alimony. *Id.* at 1288. Though the chancellor in *Elliot* had determined the agreement to be periodic alimony, this Court noted that periodic alimony cannot have a fixed termination date, and the agreement terminated after 120 months. *Id.* However, this Court declined to apply a specific label to the agreement, noting only that it was not "traditional periodic alimony." *Id.* at 1290 (¶19). We ultimately held "that the payments in this case, agreed as to amount and duration and which do not neatly fit within any alimony category, are within the broad latitude that divorcing couples have to resolve their affairs." *Id.* at 1289-90 (¶19). Because the provision's terms and the parties' intent were clear, we enforced it as written. *See id.* at (¶¶18-21).

¶33. As in *Elliot* and *East*, the alimony provision in this case does not strictly adhere to the traditional characteristics of either periodic or lump sum alimony. In fact, the parties somewhat inartfully attempted to provide for both types, calling for periodic alimony at the outset and then lump sum alimony if the wife ever remarried. However, as applied to the present issue, the terms of the agreement and the parties' intent at the time of their divorce are perfectly clear: "*Regardless of whether* [*Jennifer*] *shall remarry*, [Ryan] shall in any event pay alimony in the amount of [$900] per month . . . through the period ending November 10, 2013." (Emphasis added). Lest there be any doubt, the agreement then further

19

describes how the payments that Jennifer would receive "following her marriage" should be characterized. The parties' agreement thus makes clear that payments would *not* terminate upon Jennifer's remarriage but would continue until the date specified. Based on applicable Supreme Court "precedents" and basic "equity," "we desire to enforce the agreement of the parties reached at the time of the divorce." *Elliot*, 775 So. 2d at 1289 (¶18). When, as in this case, the parties have entered into a voluntary settlement agreement and obtained court approval, we will "enforce it" as written and "take . . . a dim view" of post hoc "efforts to modify it." *Weathersby*, 693 So. 2d at 1351. We agree with the chancellor that the alimony provision and the parties intent is unambiguous as it relates to this issue and, as such, it should be enforced as written regardless of its proper label. *Elliot*, 775 So. 2d at 1290 (¶20).

**CONCLUSION**

¶34. We find no error in the chancellor's appointment or utilization of the GAL or the chancellor's denial of Ryan's request to terminate his alimony obligation retroactive to the date of Jennifer's remarriage. We reverse and remand for further proceedings consistent with this opinion only with respect to the suspension and eventual termination of Ryan's obligations to pay for Jilanna's support, including her college expenses.[3]

---

[3] Jennifer filed her opening brief on November 17, 2014. On February 20, 2015, Ryan filed his brief and also filed a motion to strike Jennifer's brief, arguing that Jennifer's record citations were inadequate and that two statements in her brief were inflammatory and unsupported by the record. Jennifer filed a timely response to the motion to strike in which she argued that her record citations were adequate and the two challenged statements were fair and appropriate. On March 3, 2015, the Supreme Court entered an order finding that the motion should be passed for consideration with the merits of the appeal. Ryan's motion is denied. Jennifer's record citations are adequate. Further, the two specific statements to which Ryan objects played no role in our decision and would have been disregarded anyway to the extent they lack support in the record. *See Touchstone v. Touchstone*, 682 So. 2d 374,

20

¶35.   **THE JUDGMENT OF THE MONROE COUNTY CHANCERY COURT IS REVERSED AND REMANDED ON DIRECT APPEAL AND AFFIRMED ON CROSS-APPEAL.  THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR.  JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.  IRVING, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

---

380 (Miss. 1996) ("This Court will consider only those matters that actually appear in the record and does not rely on mere assertions in briefs.").