## Margaret McMahen v. William McMahen, Appellant.

*Divorce—Cruel and barbarous treatment.*

Cruelty as a ground for divorce is such conduct in one of the married parties as renders cohabitation dangerous to the physical safety of the other, or creates in the other such reasonable apprehension of bodily harm as materially to interfere with the discharge of marital duty.

*Divorce—Venereal disease.*

A wife is entitled to a divorce where her husband has venereal disease, rendering cohabitation dangerous to her health and life.

Argued Jan. 19, 1898.   Appeal, No. 278, Jan. T., 1897, by defendant, from decree of C. P. No. 1, Phila. Co., March T., 1894, No. 54, sustaining exceptions to master's report in divorce.   Before GREEN, WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.   Affirmed.

Libel for divorce.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was decree of the court.

*W. Horace Hepburn*, with him *Joseph A. Robbins*, for appellant, cited Richards v. Richards, 1 Grant's C. 389 ; May v. May, 62 Pa. 206 ; Butler v. Butler, 1 Parson's Eq. Rep. 329 ; Nye's App., 126 Pa. 341 ; 1 Bishop on Marriage and Divorce, secs. 764, 767 ; Richards v. Richards, 37 Pa. 228.

*A. S. L. Shields*, for appellee, cited Popkin v. Popkin, 1 Haggard's Eccl. Rep. 765; Mack v. Handy, 2 So. Rep. (La.) 181; Burton v. Burton, 27 Atl. Rep. 825; Grant v. Grant, 54 N. W. Rep. 1059; Mayhew v. Mayhew, 61 Conn. 233; Robinson v. Robinson, 23 Atl. Rep. 362; Walsh v. Walsh, 28 N. W. Rep. 718; English v. English, 27 N. J. Eq. 71.

OPINION BY MR. JUSTICE GREEN, July 21, 1898:

While it is to be much regretted that the learned court below filed no opinion in this case setting forth its reasons for disagreeing with the master as to his conclusions, the view we take of the testimony and its legal effect renders the solution of the controversy a comparatively easy task.

As to the acts of cruelty complained of by the wife, there is no very serious difference between her testimony and her husband's. She specifies them all in detail, and includes personal violence on his part in every instance. He admits them all, including the personal violence, and differs from her only as to the degree and frequency of the acts of violence. As admitted by himself they would be quite sufficient to sustain a decree of divorce a mensa et thoro or a vinculo, but it is not necessary to rest the decision on that branch of the case, because there is another branch of a much more serious character, as to which there is scarcely any, and no serious, contradiction. The respondent himself testifies that he was affected with syphilis for a number of years before his marriage with libellant, and that he continued to be so affected until within a very few months before his marriage, when he alleges that he was cured. The medical testimony, however, and indeed all other testimony, including his own admissions, are decidedly against him on this subject. He admitted that he had been under treatment for this loathsome disease during, practically, the whole of his married life until his wife left him. He was asked: " Q. How long had you been under treatment for it? A. I had been under treatment with Dr. Hickman off and on all during marriage, that is, after the three months after my marriage, until she left." And he also admitted that he was suffering from this disease at the very time his wife left him. He was asked: " Q. So that at the time she left you, you knew, and she knew, that you were suffering from this disorder? A. We both knew

that we were suffering.   Q. But you did know that you had
the disease?   A. Yes, sir."

It was also admitted by the defendant that his wife innocently
became infected by him with the disease before their marriage,
she claiming that it resulted from his kissing her, and all the
physicians concurring in saying that it could easily be commu-
nicated in that way.   It was fully shown by the testimony of
the wife and her husband, and by the physicians who attended
her, that she was continually affected by the disease during all
her married life, and it was testified by the physicians that so
long as cohabitation continued, the disease would continue, and
that she had already reached the secondary stage, and was on
the verge of tertiary, at the time she left her husband.   So far
as the husband is concerned, his own medical witness, Dr. Hick-
man, testified that he was in the tertiary stage.   After saying
that the defendant told him he had been treated for the disease
for a number of years he was asked : " Q. Do you believe it
was syphilis?   A. From what he told me I certainly do.
Q. Did you treat him for tertiary or secondary?   A. Tertiary.
Q. So you believe he had tertiary?   A. Yes, sir.   Q. And so
treated him?   A. Yes, sir.   Q. Can tertiary in your opinion be
cured?   A. It apparently can be, but in my opinion it cannot
be altogether cured."   As to its effect upon the wife he was
asked : " Q. How would it affect her in respect to her having
children?   A. She could conceive, go through gestation, and
have a child.   Q. And the child would be poisoned?   A. Natu-
rally so.   Q. Would you not then regard the marital relation
between two such persons as dangerous to both?   A. As to the
child and mother and father?   Q. To all.   A. Yes, sir; the
father and mother could have syphilis, and a child could be
born to that mother and do no harm to the mother; still the
child can have infantile syphilis and still a mother not be
harmed.   Q. Would it not make pregnancy dangerous?   A. It
would."

Dr. Hickman further testified that he had also treated the
respondent for syphilis since his separation from his wife, so
that it appears from the testimony of his own witness that he
continued to have the disease after his wife left him.   The doc-
tor further testified that he considered the disease incurable.
Dr. Bernardy testified that the respondent, prior to his marriage,

told him he had syphilis, and showed him his mouth, and it was full of sores; that he had also attended the libellant at the same time and found a syphilitic sore on her lip. He also said the disease could be quite innocently communicated in several ways; that he told them both before marriage that they each had the disease; that after marriage if pregnancy ensued the disease was unsafe for the wife. As all imputations of unchastity on the part of the libellant were expressly disavowed on the hearing before the master, by the counsel for the respondent, and as the respondent took upon himself all the responsibility of having communicated the disease to his wife, it must be assumed that he alone was to blame for the original contraction of the disease by her, and for its incessant continuance upon her person at all times after the marriage. In addition to the foregoing, Dr. Lorman, another medical witness, who treated the libellant for this disease from November 20, 1893, to January 25, 1894, testified that on one occasion, on January 1, 1894, he was present with both the parties, and that respondent told him that he, the respondent, "was the cause of it originally," and he added: "We had a consultation about it and I told Mrs. McMahen in the presence of her husband that this thing was liable to reappear, even though she got better, as long as she continued to cohabit with her husband. At a subsequent period she had a gummy tumor; this belongs to the tertiary stage, but I don't think she was quite that bad. . . . Q. As a matter of fact, and as a medical fact, would it or would it not have been safe for her to have lived and cohabited with her husband? A. She would have had this thing reoccur. We are taught that at no time is it well, and it would become more apparent if she became pregnant." After having testified that in his opinion the disease was positively incurable, he was asked: "Q. Please explain for what reason it was dangerous for Mrs. McMahen to cohabit with her husband? A. On account of contamination. Q. Mr. McMahen had the disease? A. I recommended a medicine for Mr. McMahen that very day; I have the original label in my pocket. Q. And Mrs. McMahen had the same malady at that time? A. She was improving then; she asked whether in her condition it would be safe to cohabit. I said that if she cohabited and had children she would again become in the same condition. Mr. McMahen was present.

Q. Doctor, did Mrs. McMahen ask you the question whether it would be safe for her to live with her husband? A. My impression is that she did; Mr. McMahen broached the subject. Q. What did he say? A. The substance was that he blamed himself; he felt very penitent. Q. Did he assent to that proposition? A. I cannot remember; I know that he was penitent. On another occasion in my store I told him that if a child was born that child would be sick, and he said, 'If my child dies, my wife will blame me, for I am to blame.' Q. Are you quite sure that Mr. McMahen said that he gave her the disease in the first instance? A. Yes, sir, I will swear to that. Q. So you advised Mrs. McMahen to leave her husband? A. No, sir; I told her the plain facts and told her to use her own judgment. She said she would have left him before, but Dr. Hickman told her she was pregnant, and then she would not leave. Q. Doctor, would Mrs. McMahen's life have been in danger had she continued to live with her husband? A. Yes, sir. Q. Just explain. A. Her condition would have become tertiary. It would naturally affect the brain, the lungs, and everything else. It is worse than leprosy, and should be so regarded. Q. Would continued cohabitation intensify the malady? A. We are taught so and I believe so."

Although the respondent was subsequently examined he did not deny any part of the statements made by Dr. Lorman, nor of the statements made by his wife of the same conversation, which was in direct corroboration of Dr. Lorman's testimony.

This rather extended review of the testimony has been rendered necessary, because the master refused a decree of divorce, and the court filed no opinion in support of the decree granting a divorce.

Upon the whole of the testimony, which was really uncontradicted as to its most important features, we have a case in which a young woman whose innocence is not at all impeached, having been contaminated with a foul and disgusting disease by her lover, who subsequently became her husband, during the period of his courtship, probably by kissing her frequently, and after marriage having been kept constantly in a diseased condition from the same cause, until she had passed into the secondary condition of the disease, and had approached to the verge of the tertiary, the most dangerous stage of the disease,

having been advised by her husband's physician that the disease would be continuous while cohabitation continued, and that her children, if she had any, would be poisoned by the disease, and that pregnancy would be dangerous and perilous to her health, and having been advised by another physician that her life would be in danger if she continued to live with her husband; that her condition would become tertiary, her brain, lungs and other vital organs becoming affected; and, having endured for upwards of five years the constant presence of one of the vilest, most shocking and dangerous diseases with which the human body can be afflicted, and being still only about thirty years of age, the question is, whether such a person is legally bound to remain in such relation with her husband during the whole of her subsequent life, and has no redress whatever in the way of a divorce?

In our opinion, to state this question is to answer it. We do not see how it is possible to imagine a more direct and palpable case of cruelty to a wife by a husband than this. It comes within not only the spirit, but the very letter, of our statute which allows divorce, " when any husband shall have by cruel and barbarous treatment endangered his wife's life, or offered such indignities to her person as to render her condition intolerable and life burdensome, and thereby force her to withdraw from his house and family." That the libellant in this case was kept in a constant state of suffering from malignant venereal disease was proved without contradiction. It was equally well established that so long as cohabitation continued the disease would continue, and that this condition was always dangerous, especially during pregnancy, and in the case of childbirth might prove fatal.

In 1 Bishop on Marriage and Divorce, section 717, it is said: " Cruelty, therefore, is such conduct in one of the married parties as renders further cohabitation dangerous to the physical safety of the other, or creates in the other such reasonable apprehension of bodily harm as materially to interfere with the discharge of marital duty." This definition was taken from the leading case of Evans v. Evans, 1 Hagg. Con. 35, and has been approved in numerous cases cited in the footnotes to Bishop. In our own celebrated case of Butler v. Butler, 1 Pars. 329, tried by Judge KING, it was held that the cruelty

which entitles a wife to a divorce is " actual personal violence, or the reasonable apprehension of it, or such a course of treatment as endangers her life or health, and renders cohabitation unsafe." This has been followed ever since. Thus in Gordon v. Gordon, 48 Pa. 226, Mr. Justice STRONG, delivering the opinion and quoting the above definition said : " This definition accords with the present doctrine of the English ecclesiastical courts. It gives the extremest possible liberal construction to our act of assembly." In May v. May, 62 Pa. 206, we said : " It is not every act of cruelty on the part of the husband that will entitle the wife to a divorce—this ill treatment may or may not endanger her life. But to entitle her to a divorce for the cause first specified there must be actual personal violence or the reasonable apprehension of it ; or such a course of treatment as endangers life or health and renders cohabitation unsafe." In 5 Am. & Eng. Ency. of Law, 790, it is said : " Cruelty as a cause of divorce is the wilful and persistent causing of unnecessary suffering, whether in realization or in apprehension, whether of body or mind, in such a way as to render cohabitation dangerous or unendurable." On page 794 the same work further says : " But excessive intercourse may be cruelty, or intercourse when the wife's health is delicate or where the husband has venereal disease," citing for the last cause Popkin v. Popkin, 1 Hagg. Eccl. 765 ; 3 Eng. Eccl. 325 ; Holthoefer v. Holthoefer, 47 Mich. 259 ; Canfield v. Canfield, 34 Mich. 519. In English v. English, 27 N. J. Eq. 71, a decree of divorce from bed and board was made on the ground of extreme cruelty, consisting mainly in gross abuse by the husband of his marital rights. The chancellor said : " There can be no doubt that she was so diseased that connubial intercourse inflicted great and distressing pain upon her, nor can there be any doubt that her condition was known to him. He has been guilty of extreme cruelty to her, so as to render it unsafe for her under existing circumstances to cohabit with him or to be under his dominion or control." To the same effect are the cases of Grant v. Grant (Minn. 1893), 54 N. W. Rep. 1059 and Mayhew v. Mayhew, 61 Conn. 233.

We are clearly of opinion that the conduct of the respondent towards his wife was of such a character as to render her condition intolerable and life burdensome, so that she was forced

thereby to withdraw from his house and family, and also that her health was thereby greatly impaired and her life endangered. It is of no consequence that inoculation occurred before marriage. It is the continuation and constant presence of the disease after marriage, making her condition intolerable and endangering her health and life that entitles her to a divorce.

The decree of the court below is affirmed and appeal dismissed at the cost of the appellant.