## Campbell *v.* Campbell, Appellant.

Argued May 4, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE,

STADTFELD, PARKER, JAMES and RHODES, JJ.

*Wm. F. Beatty,* with him *Clyde P. Bailey,* for appellant.

*Alexander J. Bielski,* with him *W. A. Walker,* for appellee.

OPINION BY JAMES, J., November 12, 1937:

On April 6, 1935, libellant filed his libel in divorce alleging that respondent, by her cruel and barbarous treatment, had endangered his life and offered such indignities to his person as to render his condition intolerable and life burdensome. On May 31, 1933 respondent was committed to the Allegheny County Home suffering from locomotor ataxia, and on the date of the presentation of the libel, was still so confined. On the day the libel was filed, libellant presented his petition, which showed that on June 28, 1933 the Potter Title and Trust Company had been appointed a guardian of respondent's estate, and asked for the appointment of a committee ad litem to represent the respondent in the divorce proceeding, upon which an order was made appointing William F. Beatty, Esq., as committee ad litem, who appeared as counsel in the court below and also in this court. It is unnecessary to detail the steps taken by the court below to protect the interests of the respondent, who was physically and

mentally able to contest the divorce. The court of common pleas entered a final decree on both grounds alleged in the libel.

Libellant, now aged 49, and respondent, 43, were married in Allegheny County on July 25, 1917 and lived with the wife's parents in McKees Rocks until the death of the wife's father. The mother then purchased a home at Crafton where libellant and respondent lived until libellant left on December 19, 1931. The mother died in 1925.

Libellant testified in part as follows: "Q. What was the cause of your separation on December 19, 1931, Mr. Campbell? A. Well, I knew she was running around with other men and I told her a couple of times about it and on a couple of occasions in the morning when I slept late she was fighting to get me out of the house and I watched from the corner and saw this fellow drive up and go in the house on several occasions. ....... Q. You stated you had other suspicions about the fact that your wife was ill with a disease. How did your suspicions arise, Mr. Campbell? A. The breaking out on the face and then in her walk. I had seen some of the cases. . Q. How did she walk? A. She walked in a stooped posture and legs straight out. Q. Were there any other reasons that caused this suspicion you had? A. Just prior to me leaving she started to become violent toward me. Q. When you speak of violence, what do you mean, Mr. Campbell? A. She would break out in rages over no reason whatever and fire things at me. Q. What would she fire at you? A. She would pick up anything she could get her hands on. She threw dishes at me on several occasions. Q. Was there anything else she threw at you besides dishes? A. I don't recall anything more."

He also testified respondent always displayed an antagonistic attitude toward him and all of his friends. A short time after the marriage, while attending a party

at the home of a friend, and while he was playing the piano, respondent demanded that he go home, cracked him on the back of the head twice and knocked him to the floor. In February 1921, libellant's father died, and he, respondent and her mother went to the home of the deceased parent, remained a few minutes, when respondent insisted that she be taken back to her own home. When he wished to return to his father's home and greet the visitors, who desired to pay their respects, respondent flew into a rage and grabbed a key and locked the door and gouged libellant on the back of the head and neck, as a result of which it was necessary for the wounds to be treated. On other occasions, when visiting with friends, she displayed a generally, mean, antagonistic attitude, and during all their relations with outsiders, she was a source of embarrassment to him. For about a year after their marriage, he took her out among his friends, but made no effort from that time on. After the separation, on different occasions, she annoyed him as he was leaving the office building where he worked. As to these incidents, he was corroborated by W. F. McCrea, a fellow-employee. He first learned that his wife was afflicted with syphilis in July, 1931, when he found in his wife's dresser a report by Dr. Ernest W. Willets, dated July 8, 1931, which showed that the Wassermann reaction was very strongly positive and the Kahn test four plus. Prior to this, his wife had informed him that she was suffering from spinal trouble, and was being treated by Doctor Orr. He also found in the dresser some pictures of one George Chillicothe, and a purported unsigned will of respondent disposing her property to Chillicothe. In 1931 he frequently saw George Chillicothe enter his home after he had left in the morning. He testified that his health was very good, and, to the best of his recollection, he had never gone to a doctor; that he had been continuously employed by the same company nearly twenty-five years; and that he had not had inter-

course with his wife during the last eight years of their married life, they having slept in separate rooms.

Mrs. Campbell, an aunt of libellant, testified, in corroboration of the injuries received by libellant when he was gouged with a key, that "it looked to me as though he had been scraped." As to respondent's antagonistic attitude and source of embarrassment to her husband, H. F. Stocker, a friend of libellant, testified she was always antagonistic "so much so that everybody just got tired of her and didn't want her in their midst ...... raising the devil, just different from anybody else." This occurred the first year of their marriage.

Dr. Ernest W. Willets testified that the report from his office of July 8, 1931, indicated that the respondent had syphilis. His testimony was that this disease can be inherited, or contracted by contact with the infection; but proof of its presence is not proof of sexual relations with one who has it. On May 8, 1934 he examined the libellant and reported that the Wassermann test and the Kahn test were both negative; but that these tests, although reliable, would not show that libellant did not have the disease in 1931, and had been cured.

Respondent, sole witness in her behalf, testified that for quite a few years she and her husband went out together until he said, "I cramped his style"; that on one occasion when he arrived home intoxicated, he choked and abused her; that he had kicked at her and used vile language more than once; that she objected to her husband's attending the parties as he was not able to afford to keep up with their style, and she did not care to see him drinking; that the only time she drank was when she was with her husband, and she had not touched any drink for ten or eleven years. As to the incident, at the time of the father's death, her testimony was that the husband had been drinking and he wanted to get rid of her so he could have a party,

and he was then intoxicated. She admitted that she had gone down to the building where libellant was employed during 1932 and 1933. No complaint was made that the husband failed to support her. According to her testimony, she learned in 1929 that she was afflicted with syphilis, and her explanation was that she contracted the disease from her husband, "because there wasn't anyone else"; that libellant forced her to continue sexual relations until the time of the separation in 1931, with knowledge of her condition.

On cross-examination, respondent identified one of the pictures taken from the dresser, as that of George Chillicothe, but had no recollection of writing the purported will; but it was conceded that the handwriting was similar to respondent's. In explanation of the visits by Chillicothe, she stated they were made to Mrs. Forsythe, a roomer in the home. On this phase, she testified: "Q. After your husband left, Mrs. Campbell, how often did Mr. Chillicothe come to visit you? A. I wouldn't know. I wouldn't remember. Q. Would you say it was daily or weekly? A. Oh, no. Q. Every other day? A. I can't say that. I don't remember. Q. But he did come there? A. Probably he came to see the woman who was staying with me. Mrs. Forsythe was there. I had her right with me since my husband left. Q. Have you Mrs. Forsythe in court here? A. No, I have lost connection with my friends and everything since I have been away. Q. Did you tell your attorney about Mrs. Forsythe? A. No, I don't think I ever did because I have never concentrated on it that much. Q. You knew Mr. Chillicothe well enough to write a will, willing all your property to him? A. I may have done something like that. I don't remember anything about it, because my condition was very upset, I wasn't responsible for what I did and haven't been for quite a while."

It is apparent that the parties to this proceeding have lived a most unhappy life, with an ending that, in

some respects, is even more tragic than death. Cruel and barbarous treatment consists of actual personal violence or a reasonable apprehension thereof, or such a course of treatment as endangers life or health and renders cohabitation unsafe; but conduct and threats, which may not amount to treatment endangering life, are properly considered in connection with other conduct under the charge of indignities to the person: *Sklan v. Sklan,* 110 Pa. Superior Ct. 226, 168 A. 481; *Conrad v. Conrad,* 112 Pa. Superior Ct. 198, 170 A. 342. What acts or course of conduct will amount to such indignities as will justify the court in making a decree of divorce, seems to be nowhere defined, and perhaps they are incapable of specification or exact definition, but they must be such as, in the language of the act, render the condition of the libellant intolerable and life burdensome: *Crawford v. Crawford,* 64 Pa. Superior Ct. 30, 33. In *Breene v. Breene,* 76 Pa. Superior Ct. 568, and repeated in many subsequent cases, we said indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation, of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient.

Neither respondent's general antagonistic and disagreeable attitude toward libellant and his friends, nor the instances in which she is alleged to have knocked libellant from the piano stool, scratched him with the key, and thrown dishes at him, were sufficient of themselves to establish either of the causes alleged. Bad temper, surliness, disagreeable disposition and antagonistic attitude have never been held sufficient to establish the charge of indignities. Nor do the attacks, over a period of several years, establish such personal violence, as endangered the life or health of the libellant, and constituted cruel and barbarous treatment. These acts, however, when taken in connection with the

proof that respondent was afflicted with a loathsome venereal disease, of which she had knowledge, yet, as we believe the testimony, never informed her husband, thereby exposing him to infection and making it possible for him to have contracted this disease, indicate such a wilful disregard for his safety as to render cohabitation dangerous. From 1929, when she first discovered she was suffering from syphilis, until the separation in December, 1931, respondent performed her household duties and cooked the meals, and the facilities of the entire household, except that they slept in separate rooms, were used in common. It may be conceded that the proof was not sufficient to establish that respondent's condition was brought about by adulterous conduct, but coupled with the unusual and most suspicious circumstances that among her personal effects were found the pictures of a man, other than her husband, and a purported will in his favor, and the presence of this man in her home on various occasions, in the absence of her husband, it indicates a settled estrangement from her husband. Her explanation that Chillicothe came to see Mrs. Forsythe does not bear the earmarks of truth, especially when it appears that she never informed her counsel that Mrs. Forsythe had been a roomer at the home, nor made any effort to obtain her as a witness. When we consider that the husband had been in good health, not having consulted a doctor for many years, and found free from disease when examined by Dr. Willets after the separation, it is incredible that he forced his attentions upon the wife, with knowledge that she was infected with one of the vilest diseases with which the human body can be afflicted. Taking into consideration all the testimony in this record, the majority of this court is of opinion that respondent's conduct toward her husband constituted such indignities as to render his condition intolerable and life burdensome. In so concluding, we are not to be understood as holding that the mere

presence of a venereal disease is of itself an indignity; but, in the absence of explanatory proof of innocent origin and notice to the other spouse of its existence and when accompanied by such additional facts as this record contains, it may amount to an indignity within the meaning of the statute.

The question, as to whether a loathsome venereal disease constitutes a ground for divorce, was raised in *McMahen v. McMahen,* 186 Pa. 485, 40 A. 795; *Baker v. Baker,* 195 Pa. 407, 46 A. 96 and *Cantor v. Cantor,* 70 Pa. Superior Ct. 108. In the McMahen case it appeared that the wife contracted syphilis from her husband, and that as long as cohabitation continued, the wife would be in danger of her life. A decree was granted. In the Baker case, where the decree was granted, and the proof was that the husband had gonorrhea, the court said: "If he had such a disease as that during the continuance of the marital relation, it must be regarded, in the absence of explanatory proof, as evidence of the fact of illicit connection with other women than his wife, there being no proof in the case that she was affected by that disease." In the Cantor case, where the husband was refused a divorce, it appeared that when doubt as to the health of the wife was first raised, she immediately withdrew from the marital relation and had not afterwards urged or solicited further association with her husband that would, in the slightest degree, affect his health. True it is, that in the present case the husband testified that he had not cohabited with his wife for some years, and had not been subjected to infection by intercourse, but this was not the only way by which libellant could have been infected with the disease.

Decree affirmed.