# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-00835-COA

**ELMER GENE FARRIS**                                              **APPELLANT**

**v.**

**REBECCA LEE JONES ROBERTSON FARRIS**                       **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/29/2015 |
| TRIAL JUDGE: | HON. CATHERINE FARRIS-CARTER |
| COURT FROM WHICH APPEALED: | TALLAHATCHIE COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | SABRINA D. HOWELL |
| ATTORNEY FOR APPELLEE: | LUTHER PUTNAM CRULL JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| TRIAL COURT DISPOSITION: | GRANTED WIFE A DIVORCE ON THE GROUND OF HABITUAL CRUEL AND INHUMAN TREATMENT; EQUITABLY DIVIDED MARITAL PROPERTY; AWARDED WIFE ALIMONY AND ATTORNEYS' FEES; AND ORDERED HUSBAND TO MAINTAIN LIFE INSURANCE |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND RENDERED IN PART - 10/04/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE LEE, C.J., WILSON AND GREENLEE, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.     The Chancery Court of Tallahatchie County granted Rebecca Lee Jones Robertson Farris (Becky) a divorce from Elmer Eugene Farris (Gene) on the ground of habitual cruel and inhuman treatment because the court found that Gene knew that he might have herpes but failed to tell Becky and transmitted the disease to her. The chancellor also ruled that the

parties' prenuptial agreement was invalid, divided the marital estate, awarded Becky alimony and attorneys' fees, and ordered Gene to maintain a life insurance policy for Becky's benefit. Gene filed a timely notice of appeal and challenges the chancellor's finding of habitual cruel and inhuman treatment, the invalidation of the prenuptial agreement, and most of the financial aspects of the divorce judgment.

¶2.    We affirm the chancellor's grant of a divorce, but we conclude that the prenuptial agreement is valid and enforceable. Because the prenuptial agreement is valid, we reverse and render in part the division of the marital estate. We affirm the chancellor's award of alimony, but we reverse and render the award of attorneys' fees because the record reflects that Becky is able to pay her own fees. We also reverse the requirement that Gene maintain life insurance, as the amount ordered by the chancellor is excessive on its face. We address each of these issues below.

**FACTS**

¶3.    Before she moved in with Gene, Becky lived in a home on five acres of land in Black Hawk in Carroll County. In 2003, she moved into Gene's mobile home in Cascilla in Tallahatchie County. The mobile home was situated on 249 acres, where Gene raised cattle. Both Becky and Gene had been married once before, and each had one or more grown children. In 2004, Becky sold her home and property in Carroll County to her daughter and used the proceeds to pay off credit card debt and to pay for her son's college tuition.

¶4.    On December 28, 2006—after they had been cohabiting for over three years—Gene

2

and Becky entered into a "Prenuptial Contract and Agreement" at the office of George Cossar, an attorney in Charleston in Tallahatchie County. Gene read the agreement aloud in front of Cossar and Becky, and Cossar told Becky that he represented only Gene. Becky testified that she did not read the agreement herself.

¶5. Becky and Gene signed the agreement in front of Cossar's secretary. Becky testified that she believed that she had to sign the agreement "or [she] wouldn't be getting married." According to Becky, she and Gene "had lived together for three years [without being married], and [she] didn't want to continue living that way." She also testified that Gene first mentioned the agreement earlier the same day, while they were eating lunch, and that they had never discussed the terms of the agreement before the meeting with Cossar. Gene, however, testified that he had told Becky much earlier that he would not get re-married without a prenuptial agreement and that he and Becky met with Cossar on a prior occasion to discuss it.

¶6. The agreement stated that Gene and Becky had both received legal advice and that they were entering into the agreement "freely and with a full understanding of its provisions and with the full knowledge and understanding of the extent of the value of each other's separate properties." Pursuant to the agreement, Gene and Becky

> agree[d] that, should a divorce occur . . . , then . . . neither [would] make a claim against the other for their separate properties including any additional separate properties acquired, whether by means of purchase, gift, inheritance or other means. [Gene and Becky further] agree[d] that their separate property [would] remain separate . . . and [would] not be construed to be marital or community property in the event of [a] divorce and such property, including the income earned from said separate property, [would] be free and clear of any claim or interest by the other party.

3

¶7.    While at Cossar's office, Becky prepared a list of her assets to attach to the prenuptial agreement. Becky testified that she understood that she was supposed to list all assets that she either owned at that time or had owned in the past. As a result, she listed seventy-seven acres in Carroll County as an asset, although she no longer owned the land, which was owned by her ex-husband. Becky testified that she completed her list in less than ten minutes and that she did not intend to mislead Gene by listing assets that she no longer owned. Gene compiled his list of assets two days prior to signing the agreement. Gene testified that he understood that he was only to list assets that he owned at that time.

¶8.    The next day, December 29, 2006, Becky and Gene were married by a justice of the peace in Lake Village, Arkansas. While they were married, Gene sold insurance and raised cattle. Becky previously worked for AT&T for nineteen years. During her marriage to Gene, she worked for Grenada Lake Medical Center, but she ceased working there when she became ill shortly before she and Gene separated. Becky also provided substantial assistance to Gene in the operation of his cattle business, including hard physical labor on a daily basis. At the time of trial, Becky received $533.94 per month in retirement benefits from AT&T and $1,059.92 per month in social security benefits.

¶9.    In 2010, Becky and Gene paid $21,000 to purchase a rental property. Becky testified that she contributed about $5,000 toward the purchase price. During the marriage, Becky and Gene collected $275 per month in rental income from the property. They also purchased a gun safe, farming equipment, and a cattle trailer during their marriage.

¶10.    Becky was diagnosed with kidney cancer in 2012. In early March of 2012, shortly

4

before she and Gene separated, Becky had surgery to remove a tumor on her left kidney at St. Dominic's Hospital in Jackson. Soon after surgery, Gene left the hospital and Becky did not see him for the remainder of the three days she was in the hospital. Becky went to stay with her daughter Sherry after she was discharged from the hospital.

¶11. Gene testified that he waited for Becky to wake up from surgery before he left the hospital. According to Gene, Becky told him that he could go home because one of her children planned to stay at the hospital with her. Gene testified that they talked on the phone throughout her stay and that Becky assured him that he did not need to return to the hospital.

¶12. Becky and Gene separated on April 5, 2012. Just prior to their separation, Becky withdrew $1,681 from the joint bank account in which she and Gene deposited their rental income. This was half of the remaining balance in the account.

¶13. On April 20, 2012, Becky filed for divorce on the grounds of habitual cruel and inhuman treatment and, in the alternative, irreconcilable differences. Gene answered and filed a counterclaim for divorce on the same grounds. However, Gene eventually withdrew his counterclaim for divorce. The case eventually proceeded to trial in February 2015.

¶14. Becky testified that Gene yelled at her several times a week. Becky recalled that she and Gene spent their first Thanksgiving as husband and wife at a cabin with her children. During the day, Gene became upset because he thought she was spending too much time in the kitchen helping her daughters and was not paying enough attention to him. Becky testified that Gene left the cabin and returned hours later drunk. One of Becky's daughters, Lois, testified that she overheard Becky and Gene have "words at the door." Lois also

5

testified that Gene "reeked of alcohol" when he returned to the cabin.

¶15.　According to Becky, Gene also kept her away from her children.  Lois agreed that she had very little contact with her mother when she was living with Gene.  Lois testified that she "felt isolated" from her mother during that period.  Becky also claimed that Gene accused her of taking things such as safety pins and silver.

¶16.　Becky also testified that she contracted herpes at some point during the marriage. Becky was unsure of the exact date that she learned that she had herpes, but she said that it was several months before she and Gene separated.  Becky testified that Gene admitted that he had herpes once she told him that she had contracted the disease.

¶17.　Gene was married previously for about three years in the mid-1990s.  Gene testified that, during their marriage, his first wife told him that she thought that she had herpes.  Gene insisted that if he had herpes, he had contracted it from his first wife; however, he was never tested and claimed to be unsure whether he had the disease.

¶18.　Becky testified that Gene had 104 cows, including five bulls, on the morning they separated.  Becky estimated that the cattle were worth $109,000.  Gene testified that in the months prior to trial, several of his cows had died and he had sold several others.  He testified that he received $300 to $500 for the cows he sold.  Gene testified that he had only about fifty-five head of cattle, including calves and four bulls, as of the time of trial.

¶19.　The couple's joint tax returns from 2008 through 2011 as well as Gene's individual 2012 and 2013 tax returns were admitted into evidence. Each of these returns showed a loss on Gene's cattle operation.  Gene testified at trial that he raised cattle as a hobby akin to

playing golf and that he rarely made money from the operation.

¶20. After they separated, Gene received $1,314 per month from social security benefits in addition to rental income. Gene testified that he continued to rent the property for $275 a month until 2014. For the first six months of 2014 Gene updated the property. In June 2014, Gene began renting to a new tenant for $375 a month.

¶21. Becky testified that she borrowed $6,000 from her daughter to pay her attorneys' fees. She testified that she also received money from Lois to make ends meet and that her other daughter, Sherry, was currently providing her with a place to live rent-free.

¶22. Becky asked the chancery court to award her a 2003 Buick LeSabre that she drove during the marriage. Becky testified that she took this vehicle with her when she moved out of Gene's home.

¶23. On April 30, 2015, the chancery court entered an order granting Becky a divorce based on cruel and inhuman treatment. The chancellor held that "each and every time [Gene] engaged in unprotected sex with [Becky] during the course of their marriage he was committing a continuous systematic cruel act upon her." The chancellor also found that their prenuptial agreement was invalid because it contained "several errors," including a misstatement that Becky had obtained legal advice before signing.

¶24. The chancellor then awarded Becky $34,500 for the alleged increased in value of the cattle during the marriage, $4,250 for her share of post-separation rental income, $17,500 for her share of the rental home's value, $5,175 for her interest in various personal property acquired during the marriage, possession of the LeSabre, and $1,000 for her interest in

7

household goods. The chancellor also awarded Becky "periodic" alimony of $1,125 per month for fifty-two months and required Gene to maintain a life insurance policy for $200,000 until the alimony had been paid in full. Finally, the chancellor ordered Gene to pay $9,228.40 of Becky's attorneys' fees.

¶25.    Gene timely appealed from the final judgment of the chancery court. On appeal, Gene raises six issues: (1) whether the chancellor erred in granting a divorce based on habitual cruel and inhuman treatment; (2) whether the chancellor erred in holding that the parties' prenuptial agreement was invalid; (3) whether the chancellor erred in dividing the parties' interests related to their rental property; (4) whether the chancellor erred in awarding alimony; (5) whether the chancellor erred in awarding attorneys' fees; and (6) whether the chancellor erred in requiring him to maintain a $200,000 life insurance policy for Becky's benefit. We address these issues in turn below.

**STANDARDS OF REVIEW**

¶26.    "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review." *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003). "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." *Id.* at 819 (¶53); *accord Retzer v. Retzer*, 578 So. 2d 608, 609 (Miss. 1990) (holding that a chancellor's finding of fact will not be reversed unless manifestly wrong or clearly erroneous). However, chancellor's conclusions on pure issues of law are reviewed de novo. *See Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).

8

¶27. "When this Court reviews a chancellor's judgment of property division we 'are to review the judgment to ensure that the chancellor followed the appropriate standards and did not abuse his discretion.'" *McKnight v. McKnight*, 951 So. 2d 594, 596 (¶6) (Miss. Ct. App. 2007) (quoting *Wells v. Wells*, 800 So. 2d 1239, 1243 (¶8) (Miss. Ct. App. 2001)). "Alimony awards are [also] within the discretion of the chancellor, and his discretion will not be reversed on appeal unless [he] was manifestly in error in his finding of fact and abused his discretion." *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993) (citation omitted). Finally, "[t]he award of attorney[s'] fees in divorce cases is left to the discretion of the chancellor, assuming he follows the appropriate standards." *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995).

## DISCUSSION

### I. The chancellor did not err in granting Becky a divorce based on habitual cruel and inhuman treatment.

¶28. Gene argues that the chancellor erred by awarding Becky a divorce based on habitual cruel and inhuman treatment. Gene insists that the record is devoid of any evidence proving that Becky filed for divorce because she contracted herpes or that the disease made it impossible for her to continue in the marriage. He also argues that there is no evidence to corroborate Becky's claim that he gave her herpes.

¶29. "Habitual cruel and inhuman treatment is conduct that either: (1) 'endangers life, limb, or health, or creates a reasonable apprehension of such danger and renders the relationship unsafe for the party seeking relief,' or (2) is so 'unnatural and infamous' as to render the marriage revolting to the non-offending spouse, making 'it impossible to carry out the duties

9

of the marriage, therefore destroying the basis for its continuance.'" *Heimert v. Heimert*, 101 So. 3d 181, 184 (¶8) (Miss. Ct. App. 2012) (quoting *Mitchell v. Mitchell*, 767 So. 2d 1037, 1041 (¶14) (Miss. Ct. App. 2000)). The party seeking a divorce must prove habitual cruel and inhuman treatment by a preponderance of the evidence. *Richard v. Richard*, 711 So. 2d 884, 888 (¶14) (Miss. 1998). "While the chancellor's determinations of the events that preceded the divorce are findings of fact, [a] finding that . . . conduct rose to the level of habitual cruel and inhuman treatment as defined as a ground for divorce . . . is a determination of law, and is reversible where the chancellor has employed an erroneous legal standard." *Potts v. Potts*, 700 So. 2d 321, 322 (Miss. 1997).

¶30. There is no published Mississippi case affirming a finding of habitual cruel and inhuman treatment based on exposure of one spouse to a sexually transmitted disease. In *Moses v. Moses*, 879 So. 2d 1043, 1048 (¶12) (Miss. Ct. App. 2004), this Court reversed the chancellor's finding of habitual cruel and inhuman treatment based on a husband's alleged transmission of herpes to his wife. We did so, however, because "[t]here was no credible evidence . . . that [the husband] transmitted to [the wife] any STD." *Id.* Moreover, because the wife alleged that "she *knowingly* married [her husband] believing he infected her with herpes" prior to the marriage, she could not "later claim that such infection [was] grounds for habitual cruel and inhuman treatment." *Id.* (emphasis added). In *Buckley v. Buckley*, 815 So. 2d 1260 (Miss. Ct. App. 2002), this Court held that "[t]he fact that one spouse causes another to contract an uncomfortable, embarrassing disease, which may affect the likelihood of that spouse again becoming married, must be included in the evaluations of fault and

10

misconduct" for purposes of determining alimony. *Id.* at 1265 (¶28). In *Buckley*, the parties agreed to an irreconcilable differences divorce, so fault and misconduct were litigated only in the context of property distribution and alimony. *See id.* at 1261 (¶3).

¶31.    A number of courts in other jurisdictions have held that exposing one's spouse to an STD may be grounds for divorce. The Rhode Island Supreme Court held that "[i]t is difficult to imagine a worse or more insidious form of cruelty." *Wilson v. Wilson*, 13 A. 102, 104 (R.I. 1888). The Iowa Supreme Court similarly held "that the communication by a husband of a venereal disease to his wife, knowingly, is good and sufficient cause for a divorce, and is cruelty of the most flagrant kind." *Holmes v. Holmes* 170 N.W. 793, 794 (Iowa 1919). The Maryland Court of Appeals held that "if a spouse, although knowing he or she is afflicted with a venereal disease, yet continues to maintain sexual relations and communicates the disease to the other spouse, such action constitutes extreme cruelty." *Kline v. Kline*, 16 A.2d 924, 925 (Md. 1940). And the Supreme Court of Pennsylvania was simply unable "to imagine a more direct and palpable case of cruelty to a wife by a husband." *McMahen v. McMahen*, 40 A. 795, 797 (Pa. 1898). There are many similar decisions from other states. *See, e.g.*, *Holden v. Holden*, 116 P.2d 1003, 1005 (Idaho 1941) ("If [the husband] knowingly communicated [gonorrhea] to [his wife], that would constitute cruelty."); *Carbajal v. Fernandez*, 58 So. 581, 581 (La. 1912) (stating that "all the courts agree" that knowing transmission of an STD to a spouse "constitutes cruel treatment"); *Holthoefer v. Holthoefer*, 11 N.W. 150, 150 (Mich. 1882) (stating that knowing transmission of an STD by a spouse constitutes "extreme cruelty" and grounds for divorce); *Darling v.*

11

*Darling*, 167 S.W. 1166, 1166 (Mo. Ct. App. 1914) (holding that knowing communication of gonorrhea to a wife was grounds for divorce); *Cook v. Cook*, 32 N.J. Eq. 475 (N.J. Ct. Ch. 1880) (holding that knowing communication of an STD to a wife was "extreme cruelty" and grounds for divorce); *Cadle v. Cadle*, 191 S.W.2d 561, 561-62 (Tenn. Ct. App. 1945) (holding that communication of a venereal disease would constitute cruel and inhuman treatment). While the most recent of the above-cited cases is more than seventy years old, we do not believe that knowingly exposing one's spouse to an STD is any less cruel today, and we agree that it may be a form of habitual cruel and inhuman treatment.

¶32. Becky testified that she contracted herpes from Gene during the course of their marriage and first learned that she had the disease only a few months before their separation. Gene never denied that he had herpes; he only said that he did not know whether he had the disease because he had never been tested. In fact, Gene admitted that his first wife told him that she had herpes. Despite this, Gene never told Becky that he might have herpes until she told him that she had contracted the disease. The chancellor found Gene's "actions of such an egregious nature that . . . each and every time he engaged in unprotected sex with [Becky] he was committing a continuous systematic cruel act upon her." Given Gene's own admissions, we cannot say that the chancellor's factual findings were clearly erroneous or that she erred in granting a divorce on this ground.

¶33. Gene argues that Becky's allegation was not corroborated by medical evidence, but Gene's own admissions are sufficient corroboration to support the chancellor's findings. *See* Deborah H. Bell, *Bell on Mississippi Family Law* § 4.02[8][d] (2005) (explaining that a

12

plaintiff's allegations of cruel and inhuman treatment must be supported by independent corroborating evidence, but the "testimony of the defendant" may be sufficient corroboration); *Gatlin v. Gatlin*, 234 So. 2d 634, 635 (Miss. 1970). Gene also argues that there was no "evidence . . . linking Becky's alleged diagnosis of herpes with the separation of the parties." However, the law only requires Becky to show that Gene's conduct was "a proximate cause of harm to [her] health and physical well being"—*not* that it was "the actual cause of the separation." *Bias v. Bias*, 493 So. 2d 342, 345 (Miss. 1986). There was sufficient evidence for the chancellor to find that Becky met this burden.

¶34. Credibility determinations are made by the chancellor, not this Court. *See, e.g.*, *Irle v. Foster*, 175 So. 3d 1232, 1237-38 (¶23) (Miss. 2015); *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013). As relevant to this issue, the chancellor obviously found Becky's testimony more credible, and there was sufficient evidence to support the chancellor's findings of fact and finding of habitual cruel and inhuman treatment. Therefore, we cannot say that the chancellor erred in granting her a divorce on that ground.

## II. The prenuptial agreement is valid and enforceable.

¶35. The chancellor held that Becky and Gene's prenuptial agreement was invalid, reasoning as follows:

> [Becky] felt that she was under pressure to sign the agreement because she had been living with a man without the individual and societal protection of marriage for three years. [She] sold her home and land when she moved in with [Gene]. At the time of this marriage [Becky] was a lady of seasoned years without a personal home.
>
> The Prenuptial Contract is flawed and contains several errors. First, on page two (2) of the agreement it is provided that "*Each of the parties hereto*

> *has secured legal advice prior to the execution of this Contract . . .* [and] *are entering into this Agreement freely and with full understanding . . .*" The Court would grant that the parties had lived a long and rich life making it advisable for them to have such an agreement. However, an agreement such as this must be entered into willingly with a clear and settled mind. Both of the parties herein did not enter into the Prenuptial Contract and Agreement with full and honest disclosure. The Court would find that this is not a valid agreement.

(Emphasis by the chancellor).

¶36. While Becky argues that the chancellor's ruling should be affirmed, Gene argues that the agreement is valid and enforceable and should not be invalidated simply because Becky did not obtain legal advice prior to its execution. Gene maintains that Becky entered into the agreement voluntarily and that the parties fully disclosed their assets to one another.

¶37. The Mississippi Supreme Court has held that a prenuptial agreement "is just as enforceable as any other contract." *Mabus*, 890 So. 2d at 818 (¶53) (quoting *Smith v. Smith*, 656 So. 2d 1143, 1147 (Miss. 1995)). A prenuptial agreement must be "fair[] in the execution." *Id.* at 818-19 (¶53) (quoting *Smith*, 656 So. 2d at 1147). This "means that the agreement must be entered into voluntarily, and each party must disclose his or her financial assets." *Sanderson v. Sanderson*, 170 So. 3d 430, 435 (¶14) (Miss. 2014) (quoting *Estate of Hensley v. Estate of Hensley*, 524 So. 2d 325, 327 (Miss. 1988)). "Fair disclosure can be found either by the parties providing financial disclosure statements or by their independent knowledge of each other's financial state." *Id.* at (¶15). "Fairness in the execution can be affected by the presence of individual counsel, whether the parties had time to review the agreement, education of the parties, and whether the agreement was explained." *McLeod v. McLeod*, 145 So. 3d 1246, 1251 (¶24) (Miss. Ct. App. 2014). However, the execution of the

14

agreement may be fair even if each side is not separately represented by counsel. *Id.* at (¶26); *Sanderson*, 170 So. 3d at 435 (¶16).

¶38.    In this case, Gene and Becky had lived together for three years before they were married, and Becky testified that she assisted Gene in his cattle business.  There is no question that Becky was aware of Gene's assets.  Moreover, Becky makes no claim that Gene threatened to evict her from his home or take any other punitive action if she did not sign the prenuptial agreement.  Her only claim is that she knew that she would not be getting married if she did not sign it.  In other words, if she refused to sign, she and Gene would continue to live together, without the benefit of marriage, just as they had been for three years.  While Becky testified that she did not read the agreement, it was read to her, and she makes no claim that she was prevented from reading it or that she did not understand its relatively straightforward terms.

¶39.    Under Mississippi law, a prenuptial agreement is not invalid simply because one of the parties did not receive independent legal advice before its execution. *Sanderson*, 170 So. 3d at 435 (¶16).  Cossar made clear to Becky that he represented Gene only.  Despite this, Becky did not ask to consult with separate counsel or voice any objection to the agreement.  Becky apparently knew that Gene would not go forward with a wedding without a prenuptial agreement, but, standing alone, that is not a reason to invalidate the agreement.  Gene, of course, had every right not to get married, so his unwillingness to do so without a prenuptial agreement does not render the execution of the agreement "unfair." *See Barocas v. Barocas*, 942 N.Y.S.2d 491, 492 (N.Y. App. Div. 2012); *Colello v. Colello*, 780 N.Y.S.2d 450, 453

15

(N.Y. App. Div. 2004). Moreover, this case does not involve an agreement presented on the eve of a wedding that involved elaborate preparations or a large number of guests; rather, Becky and Gene were married the next day before a justice of the peace with no other friends or family present. *See Sanderson*, 170 So. 3d at 345 (¶16) (noting "the informal nature and scope of the wedding"). The record makes clear that the only possible consequence if Becky refused to sign would be that she and Gene would continue living just as they had been for three years. While Becky clearly wanted to get married, her mere preference for marriage is insufficient to establish unfairness in the execution of the agreement. Therefore, the chancellor erred in refusing to enforce the agreement.

¶40. In substance, the agreement simply provided that neither Becky nor Gene—who were both in their sixties, had been married and divorced previously, and had grown children—would "make a claim against the other for their separate properties including any additional separate properties acquired, whether by means of purchase, gift, inheritance or other means." Becky and Gene further "agree[d] that their separate property [would] remain separate . . . and [would] not be construed to be marital or community property in the event of . . . divorce and [that] such property, including the income earned from said separate property, [would] be free and clear of any claim or interest by the other party."

¶41. Given the clear language of the agreement, Becky was not entitled to any award for the increased value of Gene's cattle during the course of their marriage. The cattle were Gene's separate property prior to the marriage and should remain separate according to the terms of the prenuptial agreement. Accordingly, we reverse the chancellor's award to Becky

16

of $34,500, representing the alleged increase in value of the cattle, and we hold that Becky is not entitled to any award based on the value or increase in value of Gene's cattle. The chancellor also ordered Gene to pay Becky various sums for her interests in farming equipment, household goods, and a rental property that the parties acquired during their marriage. These aspects of the judgment are unaffected by our holding that the prenuptial agreement is valid and enforceable, and they are affirmed.

### III.    The chancellor did not abuse her discretion in dividing the parties' interests related to the rental property.

¶42.    Gene next argues that the chancellor erred by awarding Becky fifty percent of the value of their rental property because she only contributed $5,000 toward its $21,000 purchase price. In a related assignment of error, Gene claims that the chancellor erred by awarding Becky half of the gross rental income that he collected on the property after their separation. Gene argues that this was too much because, at the time of their separation, Becky withdrew $1,686.71—half the balance—from the bank account that they used for the rental property. He also argues that the chancellor's award of rental income did not take into account expenses that he incurred in connection with the property after Becky moved out.

¶43.    However, it is well settled that "an equitable division of property does not necessarily mean an equal division of property," *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994), and these awards were only one component of the overall division of property. The chancellor did not abuse her discretion simply because she awarded Becky a greater percentage of the value of the rental property than Becky contributed to its purchase. Nor did the chancellor abuse her discretion by not subtracting certain expenses from the award

17

of rental income. Finally, although the chancellor did not make specific findings of fact regarding the *Ferguson* factors, *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), her discussion of relevant facts elsewhere in her opinion was sufficient to justify the portions of the judgment that we affirm herein. *See Palmer v. Palmer*, 841 So. 2d 185, 190 (¶18) (Miss. Ct. App. 2003).

### IV. The award of alimony was not an abuse of discretion.

¶44. The chancellor awarded Becky "monthly periodic alimony in the amount of $1,125.00 for a period of fifty[-]two (52) months." She found that an application of the *Armstrong* factors, *Armstrong v. Armstrong*, 618 So. 2d at 1280, necessitated an award of monthly periodic alimony to Becky. The chancellor concluded that "[i]t is unreason[able] to expect [Becky,] who is seventy (70) years old with numerous health issues and suffering from the life altering disease of herpes[,] to undergo a rehabilitative employment process." Gene, however, insists that it was "manifest error" for the chancellor to award Becky $1,125 per month in alimony. According to Gene, this represents 77.50% of his monthly income, is unreasonable, and should be reversed.

¶45. The chancellor's award of $1,125 per month for fifty-two months cannot be treated as periodic alimony because "periodic alimony cannot have a fixed termination date." *Waldron v. Waldron*, 743 So. 2d 1064, 1065 (¶5) (Miss. Ct. App. 1999). Indeed, on appeal Becky admits that the "alimony award is clearly not periodic because the award has a fixed lump sum amount and provides for periodic monthly payments of the lump sum amount." *See Lowrey v. Simmons,* 186 So. 3d 907, 918 (¶29) (Miss. Ct. App. 2015) ("A specific period

18

of time for which payments are to run and a fixed sum of money are two characteristics of lump sum alimony."). We agree with Becky that the chancellor awarded her lump sum alimony, and we will evaluate the award on that basis.

¶46. "Lump-sum alimony has been described as 'a means of adjusting financial inequities that remain after property division." *Lewis v. Pagel*, 172 So. 3d 162, 176 (¶29) (Miss. 2015) (quoting *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶12) (Miss. 2011) (quoting Bell, *supra*, §9.02[2][a][ii])). "It is intended as an equalizer between the parties to serve equity amongst them completely once and for all." *George v. George*, 22 So. 3d 424, 429 (¶11) (Miss. Ct. App. 2009) (brackets omitted). "[W]hen 'lump-sum alimony is awarded as a mechanism to equitably divide the marital assets, then chancellors may conduct their analysis under the *Ferguson* factors.'" *Lewis*, 172 So. 3d at 176 (¶29) (quoting *Davenport v. Davenport*, 156 So. 3d 231, 241 (¶34) (Miss. 2014)). However, "when the chancellor awards lump-sum or periodic alimony after equitably dividing the estate, the chancellor should consider the *Armstrong* factors." *Id.*

¶47. In this case, although the section of the chancellor's opinion addressing alimony precedes the sections dividing the marital estate, the chancellor did not use the alimony award "as a mechanism to divide the marital assets." *Id.* Rather, the chancellor separately addressed the division of the various marital assets. Accordingly, it was appropriate for the chancellor to look to the *Armstrong* factors to determine whether to award lump sum alimony. *Id.*

¶48. Moreover, we cannot say that the chancellor abused her discretion by applying the

19

*Armstrong* factors and awarding alimony of $1,125 per month for a period of fifty-two months. Although the parties were married only six years prior to their separation, the chancellor found that Becky contributed substantially to the operation of Gene's cattle business for a total of nine years. In addition, Gene has separate assets in the form of real estate and cattle worth somewhere between $300,000 and $450,000, whereas Becky has almost no separate assets. *See* Bell, *supra*, § 9.04[4][g] (Under *Armstrong*, "[t]he court should consider both assets received in equitable distribution and separate property assets."). The chancellor was also within her discretion in taking into consideration Becky's advanced age, even though the marriage was not a long one. *See Parsons v. Parsons*, 678 So. 2d 701, 704 (Miss. 1996). Finally, the chancellor's finding that Gene was guilty of habitual cruel and inhuman treatment is also relevant to the *Armstrong* analysis. *See Armstrong*, 618 So. 2d at 1280. Given the chancellor's factual findings, we cannot say that her award of alimony was an abuse of discretion—although it was improperly characterized as periodic alimony rather than lump sum alimony.

> **V.** **The award of attorneys' fees was an abuse of discretion because Becky has the ability to pay her own fees.**

¶49. The chancellor awarded Becky $9,228.40 in attorneys' fees after reviewing a bill for $12,141.49 submitted by Becky's attorney. The chancellor found that Becky was entitled to attorneys' fees because Gene was at fault for the divorce, and because Gene had "significant resources and assets" whereas Becky had limited assets and earning capacity. The chancellor also noted that the divorce had been pending for over two years and that Becky's attorney had litigated the case diligently.

¶50. "An award of attorney's fees is appropriate in a divorce case where the requesting party establishes an inability to pay." *Williams v. Williams*, 179 So. 3d 1242, 1254 (¶42) (Miss. Ct. App. 2015) (quoting *Stewart v. Stewart*, 2 So. 3d 770, 776 (¶18) (Miss. Ct. App. 2009)). "However, if a party is financially able to pay her attorney, an award of attorney's fees is not appropriate." *Id.* (quoting *Stewart*, 2 So. 3d at 776 (¶18)). In addition, if *neither* party has the ability to pay more than his or her own fees, no fees should be awarded. *See Sarver v. Sarver*, 687 So. 2d 749, 755 (Miss. 1997), *overruled on other grounds by Pearson v. Pearson*, 761 So. 2d 157 (Miss. 2000).

¶51. We conclude that the award of attorneys' fees to Becky was an abuse of discretion because the evidence does not establish that she is unable to pay her fees. Under the provisions of the judgment that we affirm today, the chancellor ordered Gene to make cash payments to Becky totaling $27,925, as well as lump sum alimony payments totaling $58,500 over the next four-plus years. In contrast, the evidence showed that Gene had little in the way of regular income, cash, or other liquid assets. Thus, Gene almost certainly would have to sell land or cattle in order to pay Becky's attorneys' fees. Under these circumstances, we hold that Becky is able to pay her attorneys' fees, and therefore it was an abuse of discretion to order Gene to pay them for her. *See Jones v. Jones*, 917 So. 2d 95, 104 (¶30) (Miss. Ct. App. 2005) (holding that a wife's net worth of approximately $62,000 demonstrated her ability to pay her own attorneys' fees, notwithstanding her objection that her assets were illiquid, in the form of home equity and a state retirement account); *see also Seymour v. Seymour*, 960 So. 2d 513, 520-21 (¶18) (Miss. Ct. App. 2006) (holding that a wife was able

21

to pay her own attorneys' fees because she had "an investment account of $16,000, which could be liquidated" to pay the fees).

## VI. The chancellor erred by ordering Gene to maintain a $200,000 life insurance policy for the benefit of Becky.

¶52. The chancellor ordered Gene to maintain a $200,000 life insurance policy "until such time as the awarded alimony had been paid in full." Under our precedents, this was excessive. "An alimony payor 'may be required to maintain life insurance in an amount sufficient to satisfy payment of alimony obligations that survive the payor's death.'" *Coggins v. Coggins*, 132 So. 3d 636, 644 (¶35) (Miss. Ct. App. 2014). Here, Gene's total alimony obligations are only $58,500. Accordingly, the chancellor's requirement that Gene maintain a $200,000 insurance policy was excessive. In relevant part, we reverse and render the judgment so as to require Gene to maintain a policy in the amount of $58,500 or the total remaining alimony due to Becky, whichever is less.

## CONCLUSION

¶53. To summarize, we affirm the judgment of the chancery court granting Becky a divorce from Gene on the ground of cruel and inhuman treatment. We also hold that the parties' prenuptial agreement is valid and enforceable, and we therefore reverse and render the part of the judgment awarding Becky $34,500 for the alleged increase in the value of Gene's cattle. We also reverse and render the part of the judgment ordering Gene to pay Becky's attorneys' fees in the amount of $9,228.40. We reverse the part of the judgment ordering Gene to maintain a life insurance policy in the amount of $200,000; we render judgment that Gene must maintain a policy in the amount of $58,500 or the total remaining alimony due to

22

Becky, whichever is less. We affirm the award of alimony, although we hold that in substance and legal effect it is lump sum alimony, not periodic alimony. And, finally, we affirm all other aspects of the judgment, including the chancellor's division of the parties' interests relating to the rental property.

¶54. **THE JUDGMENT OF THE CHANCERY COURT OF TALLAHATCHIE COUNTY, FIRST JUDICIAL DISTRICT, IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ALL COSTS OF THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO THE APPELLEE.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, FAIR AND GREENLEE, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**